## Wigle *against* Wigle.

An arrangement in writing, by which one, in anticipation of death, disposes of his effects, and at the same time delivers the possession of them, shall be considered as revoked by the redelivery of the effects: and parol proof may be given that there were other considerations for the execution of the paper, which gave it the character of a contract.

ERROR to the common pleas of *Westmoreland* county.

This was a feigned issue to try the validity of a paper purporting to be the last will and testament of Daniel Wigle, deceased.

The plaintiff, to sustain the issue on his part, gave the following testimony:

Thomas Hanna, sworn, testified: It is my belief that the name is Daniel Wigle's handwriting. I have seen him write often: he lived within eighty rods of my house for twelve years. I am acquainted with his handwriting: seen him write his name different times. About a year before the date of this paper, saw him write his name: perhaps it was not so long. He could read writing, and was an English scholar. The body of the paper, I presume, is in the handwriting of Jacob Wigle. Have frequently seen Wigle, but cannot say how long before the date of the writing. He lived four miles from me when he died. Some time before he died he came past my house and said he had been kind of driven from his house, and had a temporary residence at Mr Frigg's. Lived sometimes in Robbstown, and sometimes at Frigg's. I think he lived at Frigg's in June, July and August of 1835; I am not certain as to the time. Have frequently seen him read writing.

Alexander Hanna, sworn, testified: It is the impression of my mind that that is his handwriting. I have frequently seen him write. I believe it to be his handwriting. Have frequently seen him write. Cannot tell where he lived when the paper was written. I saw him write before and after the paper was written. He gave me a receipt the winter before, or the winter after; I gave the receipt to my brother Thomas. I wrote the body of the receipt. He had no children. He had been married twice. Had a wife at the date of the paper. Jacob Wigle was his nephew. He died in the fall or beginning of the winter. Snow on the ground when he died.

Alleged will read in the following words:

"May 14, 1835. I do certify by these lines, that I have left all my notes with Jacob Wigle, and do certify by these, that he shall be the possessor of all, should I be taken away unexpectedly: as witness my hand and seal.          DANIEL WIGLE." [L. S.]

The defendants, to maintain the issue on their part, offered to prove by witnesses, that at the time of the execution of the paper

[Wigle v. Wigle.]

alleged to be the last will of Daniel Wigle, the agreement of Daniel and Jacob was, that he, Jacob, should support Daniel, during his life, for which he was to get the bonds; also, that Jacob refused to perform that agreement, but turned Daniel out of his house, and gave him up his bonds, and refused to support him; and that this paper was executed in part of said agreement, and that the bonds and notes were in the possession of the latter at the time of his death: also, that the parties considered the paper a nullity.

To all which parol testimony the plaintiff objected, and the court overruled the objection, and the plaintiff excepted.

Philip Weaver, sworn, testified: I never heard J. Wigle saying any thing about a will. I heard him say that Daniel Wigle, his uncle, was living with him: that he got drunk: that he would not keep him about him on that account. Do not know how long he lived with him. I think when Jacob Wigle told me so, Daniel Wigle was living at Frigg's. This was the summer before Daniel died. He died at his home in Robbstown.

George Swab, sworn, testified: As we were going from the burial of Daniel Wigle, Jacob Wigle told me that he had all the old man's writings, and had given them up all, except a few lines, and he had forgotten them, or he would have given them along. He said those few lines were to sign all his property to him, Jacob, but they were of no account; that there was no witness to them. He said while there was no witness to it, he thought they were of no account; and he told me that he was to maintain the old man, but he would not have him about the house for all he was worth, the way the old man carried on drinking, and so on. These few lines was his will. Does not know he was to keep him. While he signed all to him, it was for that. Had no other conversation with Jacob Wigle. He gave no reason why he was to keep him. It was some time in the fall: do not know the year. It is not quite three years: think it three years against fall.

Abraham Price, sworn, testified: I heard Jacob Wigle saying, directly after he turned Daniel Wigle out, that Daniel came there and wanted him to keep him during his life; and he gave him his bonds and notes to keep him during his life: and he said they had been writing a will, or something: and then Daniel Wigle went away to a neighbour's house to get signers; and when he came back he was pretty well in liquor, and abused the house, and upset a table, and broke every thing that was on it. And then he gave him back his notes and bonds that he had, and told him to begone, that he would not have such a man about his house; he would not keep him for all he was worth. Do not know when he went there: cannot tell the time of the year. Have heard he was there three or four days. It was in 1834 or perhaps in 1835. Cannot say whether it was before or after harvest. Harvest was in July. Was working on the road.

Samuel Smith, sworn, testified: About two years ago I heard

[Wigle v. Wigle.]

Jacob Wigle saying that his uncle Daniel was going to live with him: that he was also going to quit drinking. Some time after that, a week or ten days, he said his uncle Daniel had gone again; that he had drank so, he could not suffer him about the house: that he would not harbour a drunkard about his house for all he was worth. When he had come he agreed to quit the whiskey: that he was going to give him all he had. Recollect nothing about an agreement. It seems to me he said he had his papers: that he gave them to him when he was going away. Knew the old man. He was sober at times: pretty generally drunk. I have seen him go toward Jacob Wigle's: cannot say that I saw him there. Live from half a mile to three quarters from Jacob Wigle's. Did not see Daniel Wigle at Jacob Wigle's in the spring of 1835.

William M'Kown, sworn, testified: In the latter end of May 1835, I was at Jacob Wigle's; he stated to me, that his uncle Daniel had come to live with him, and that he intended to live with him as long as he lived; that he had left his home, in Robbstown, stating that the old gentleman had agreed to quit drinking and to live a sober life, and that he had delivered into his hands, his notes and papers, to the amount of 32 or 3300 dollars, and that he was to give them to Jacob Wigle. Shortly after he told me his uncle Daniel had gone. I asked him what was the matter? Mr Wigle stated that he had taken to drink again, and that he could not put up with it, and that he would have to go; they had some words; the old man said he could go; in the act of going, Jacob Wigle asked him if he wanted his papers, he said yes, says Mr Wigle, I got his papers and handed them to him, and said, I would not keep you for all you are worth, and as much more; said nothing about any writing, that I recollect. It is possible I might have had other conversations. This was in the spring of 1835; he died the next fall, or winter.

John Rhodes, sworn, testified: Sometime after the old man had left Jacob Wigle, I heard him, Jacob, tell, that the had given up all the writings he had belonging Mr Wigle, had not the scratch of a pen belonging to him, nor did not want to have any, nor he would not keep him for all he was worth, or as much more; heard him say nothing about the arrangement they had made, nor about a paper that was written at the time. Never saw him there afterwards.

Joseph Stokely, sworn, testified: Daniel Wigle was rather an intemperate man. A short time after the death of Wigle, Doctor Keiffer and myself found those notes and bonds in her possession. The old man died sometime late in the fall of 1835; there was snow on the ground.

Jacob Everett, sworn, testified: Shortly after the old man left Jacob Wigle, in a conversation with Jacob Wigle and his wife, they told me that their uncle Daniel had came there; that their uncle Daniel had willed something like 30 or 3300 dollars; the old

[Wigle v. Wigle.]

man had promised to keep sober; but had no witness to the writings, that was made. A day or two after the old man went away; on his way back some person found him along the river in liquor, the person came and told Jacob Wigle; Wigle told me he went down to where the old man lay; little way off was a bottle standing with some liquor in it. Wigle says he took the bottle, put it away, and brought the old man to the house, as well as he could; they had just eat their supper; they sat the old man some victuals on the table; the old man set down and eat his supper; at the time he was done he fell back and kicked the table over, cut himself bad, and called out, it was a black man knocked me down. J. Wigle said you have in your inside what knocked you down, took him to the kitchen, fixed a bed by the fire, and put him in it, and the next morning he started, but shortly returned; cannot say whether before or after breakfast; when he came back Jacob said he was trying a gun. Daniel said, what is the matter, uncle Jacob? Jacob said, matter enough, uncle Daniel, I have had my peace disturbed last night more than enough; the old man said, if I disturbed your peace, I can go away, and Jacob said he was welcome. Accordingly the old man got the papers, which he had lodged in Jacob Wigle's hands, and took them with him; their bargain was also, that he was to quit drinking whiskey if he wanted to live with him, excepting one or two drams a day, but not to get drunk. He said he was to have this money, or what these notes called for. Providing he kept sober, he was to live with them, the said uncle Daniel had willed them his property, no witness to the writing. When Daniel came there, he said that he was afraid of his life, that he did not live agreeably with his wife.

Inventory to Daniel Wigle's estate, read in evidence, (*pro ut* inventory.)

The plaintiff, further to maintain the issue on his part, gave the following evidence:

Rebecca Jones, sworn, testified: I was present when Daniel Wigle came to Jacob Wigle's, we were eating breakfast, and he came and sat down and ate his breakfast; after he had eat he told Jacob Wigle to get his pen and ink, and see how much he was worth; and after he had counted up his notes, he told him that he should write as he would tell him. When he wrote, he said it would answer, and he gave it to uncle Daniel, and he read it and put his name to it, and said that he wanted to make him his lawful heir, for they had threatened to take his life; and he did not know what minute they would take his life, and he wanted to make him his lawful heir, and then he started off to bring his tools, to live with us, and the next morning he was leading him along the river, he was uncommon drunk; then the next morning he got up at daylight and went out, he came in before we eat breakfast; he was very drunk again; after he eat his breakfast, he went up stairs and laid down; after he got up, Jacob was trying a gun, and he kept

[Wigle v. Wigle.]

following him, and he said, calling Jacob, what makes you look so devilish dry? and Jacob said, uncle, it is no wonder, for my feelings have been hurt last night and this morning, more than they have been these five years; and Daniel said he could go and drown himself; and Jacob said he should not do that, for the world was big enough to keep him; then he started, he was sober when he came the first morning; Jacob asked him, uncle Daniel don't you want your papers, and he said yes, and he gave him his papers. I am no relation, have lived eight years with Jacob Wigle. He was middling full. I am now in my sixteenth year; he came on Wednesday, and went away on Friday morning, He was there three or four times afterwards. He appeared to be on good terms. Once middling full, and the other times sober; said that they had attempted to take his life in Robbstown. He had left his wife on Wednesday. I think this was two years ago last May. He gave the paper he signed to Jacob Wigle's wife, and all the papers to put away. When he came back, I never heard him ask for any paper.

John Kuhns, Esq., sworn, testified: In August 1835, at court, Daniel Wigle lodged at my house; said he and his wife were parted; that he had paid debts for her, to the amount of 300 dollars; said he did not know how he would get that money. I said it made no difference, you will die some day and she will fall heir to it. He said he would fix her for that; that he would have it on record.

Henry Drum, sworn, testified: Cannot tell the time when Daniel Wigle died; he died at Mrs Wigle's. He was not ill, to my knowledge, until I heard he was dead. I lived within four hundred yards of his house. I understood from him, that him and his wife were on bad terms. Daniel Wigle said that the old woman and Ephriam had threatened his life, that he was afraid of it; this was in the summer before he died, do not know the time; he was living with her at this time. He went away and came back, do not know whether he was working at Frigg's or not. He had been back and forward different times.

George Friggs, sworn, testified: Daniel Wigle died in 1835, about the 1st of November. I understood he died in Robbstown. I was there the Monday before he died; his wife told me that he was very sick, and not able to talk with me. I said I would like to see him, she said it was not worth while. I saw him three or four weeks before he died, I saw him at my house, I did not afterwards, until he was raised. He died the next Friday after I called to see him.

The defendants, further to sustain the issue on their part, again offered Joseph Stockley, who testified: Daniel Wigle had been sick three or four days, he recovered and went to work. He then took sick and died in a few days. Betwixt these times he appeared to be of as sound mind as I had seen him.

[Wigle v. Wigle.]

The defendants, further to sustain the issue, offered Melinda Kuhns, sworn, (to the admission of whose testimony the plaintiff objected, and the court overruled the objection, and the plaintiff excepted,) who testified: That several mornings before he died, he said to Ephraim, that he was going away and he never expected to see him again, he said that his wife should have all his property, that Ephraim should take all his money and buy his wife a home in Ohio. In the night he took sick, he said he thought he was dying, that we should send for witnesses and get a will, that he wished his wife to be heir to his estate, we sent for Doctor Keifer, he gave him medicine and he got better. He went about after this conversation. It was more than two weeks before he died; a great deal longer, cannot just say how long it was before he took his last sickness, he made these declarations, cannot say whether Doctor Keifer was present or not.

The court below (White, president) charged the jury, that the paper had no legal validity as a will.

*Nichols* and *Findlay*, for plaintiff in error, cited 1 *Roper on Leg.* 241; 2 *Halst.* 414; 8 *Serg. & Rawle* 508.

*H. D. Foster* and *Coulter*, contra, were stopped by the court.

Per Curiam.—When the cause was here before, (5 *Watts* 486,) the argument presented a question of proof, not of testamentary character; and no more was decided. Had the character of the paper been before us, we might very possibly have determined against its right to probate; for, viewed in connection with the parol proofs, it looks so very like a contract for maintenance put in writing, to preserve the evidence of it from the casualty of sudden death, that it is difficult to believe that it might not have afforded reciprocal remedies. But conceding it was originally intended for a will, nothing is clearer than that it was revoked by the resumed ownership of the securities deposited with the nephew, and by the recision of the whole arrangement; particularly when it is considered that the paper itself was prevented from being delivered up only by accident. It was, therefore, a clear case of revocation by an act declarative of the intent.

Judgment affirmed.